Pamela R. PFAU, Plaintiff,

v.

COOPERS & LYBRAND, Defendant.

No. 88 CIV. 5429 (SWK).

United States District Court,
S.D. New York.

July 13, 1990.

745

Deborah Rothman, New York City, for plaintiff.

Hughes, Hubbard & Reed, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiff brought this Title VII action for employment discrimination stemming from the denial of a partnership in the defendant accounting firm, Coopers & Lybrand ("C & L"), in 1985, 1986, and 1987, as well as defendant's refusal, in 1987, to transfer her to a C & L office outside of New York City. Plaintiff's claims also include an Equal Pay Act claim, as well as pendent state law claims. Presently before this Court is defendant's motion for partial summary judgment, Fed.R.Civ.P. 56, and for dismissal

pursuant to Fed.R.Civ.P. 12(b). Also before this Court is plaintiff's appeal from a discovery order of Magistrate Roberts.

## BACKGROUND

From May 21, 1979 until July 30, 1987, the plaintiff was employed by defendant in its Computer Audit Assistance Group (hereinafter, "National CAAG") in New York City. In 1984, as in all prior years, Glenn Davis, a partner of defendant who had promoted plaintiff from the position of CAAG supervisor to that of CAAG Manager in January of 1981, rated plaintiff's job performance as "outstanding." Affidavit of Pamela Pfau at Exhibits D, E. By 1984, plaintiff responsibilities had grown, as she had become the manager responsible for the day-to-day operations of National CAAG, as well as manager in charge of communications for the then-separate Auditing directorate and EDP directorate. *Id.* at ¶ 10. In May of 1985, Stanley Halper, a National Director partner of the defendant, promoted plaintiff to the position of coordinator of CAAG services. Plaintiff simultaneously held the position of manager in charge of National CAAG. Plaintiff was the only female and the only non-partner in charge of a department in that directorate. Plaintiff's Affidavit at 10. In a May 6, 1985 memorandum to CAAG Partners, Stanley Halper stated that plaintiff had "contributed significantly to our CAAG Practice" and that her efforts produced an "outstanding success." Halper also noted that plaintiff "work[ed] closely with all the National Directors and ha[d] excellent rapport within the National office." Halper concluded by stating that plaintiff had "been key to establishing a position of quality service" and had "played an important role for CAAG National." Pfau Affidavit at Exhibit F.

During the 1985 and 1986 partnership admission process, plaintiff was formally proposed and considered for admission to the defendant partnership, but her candidacy was twice deferred by William Holland, Deputy Chairman of C & L. Notwithstanding the calibre of plaintiff's evaluations and the significant extension of her responsibilities throughout her years at Coopers and Lybrand, Mr. Holland stated that he did not think that there was enough information "to ... assess [plaintiff's] performance" and that "the duties she has performed do not provide me with a sufficient base to form a positive conclusion." Plaintiff's Affidavit, Exhibit H.

On July 21, 1986, plaintiff began a vacation, the need for which appears to have been brought on by a nervous breakdown. *See* Letter of Kenneth Marx (Plaintiff's spouse) to Glenn Davis, dated October 1, 1986, attached as Plaintiff's Exhibit I. This vacation was scheduled to end no later than September 15, 1986. However, because of plaintiff's severe depression, plaintiff did not return to work on that date. Plaintiff's 3(g) statement, attached as Exhibit A. During her absence, plaintiff told defendant that she would not return to New York. She explained that her "past experiences in New York make it very difficult ... to consider any position there...." Letter from Pamela R. Pfau to Michael Bealmear, attached as Plaintiff's Exhibit O. Although defendant allegedly attempted to find a suitable position out of New York, no such position was found and plaintiff did not return to work. Plaintiff's 3(g) statement, Exhibit A. Plaintiff remained on paid, authorized leave until July 1987, and technically reported to Murray Hirsch, the partner in charge of National CAAG during this time. In July 1987, defendant terminated plaintiff's employment.

On December 22, 1988, Magistrate Roberts, who is supervising discovery, entered a discovery order limiting the discovery of personnel files to manager rating forms and partnership profiles for all successful partnership candidates for the years 1985 to 1987. The order further limited discovery to successful candidates employed in the national headquarters, located in New York where plaintiff had been employed, and for the successful candidates in plaintiff's area of employment, the CAAG discipline, nationwide. In recognition of plaintiff's request for broader discovery, the Magistrate also permitted her to depose Robert McDowell, C & L's personnel director, and granted leave to renew the re-

quest for firm-wide discovery if supported by information uncovered in discovery, including the McDowell deposition.

Plaintiff renewed her request but was denied broader discovery by the Magistrate's order of April 28, which adhered to the discovery parameters of the earlier December 22, 1988 order. The Magistrate found that broadening discovery would not be reasonably calculated to either produce or lead to the production of admissible evidence. By an order dated May 8, 1989, the Magistrate clarified the April 28, 1989 order to include unsuccessful partnership candidates, as well as successful candidates. Plaintiff has appealed the April 28 and the May 8 orders to this Court, and the defendant has responded.

### DISCUSSION

Summary Judgment

It is axiomatic that a motion for summary judgment lies only when there is no genuine issue of material fact. Fed. R.Civ.P. 56(c). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. In deciding whether the movant has met this burden, the court must resolve all ambiguities against the movant. Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir.1987) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The movant may discharge this burden by showing an absence of evidence of support to the non-movant. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-movant then has the burden to come forward with "special facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus-

trial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Defendant moves this Court for summary judgment on plaintiff's claim arising from the 1987 denial of partnership. Defendant further argues that summary judgment should be granted on plaintiff's allegations of discrimination regarding the failure to transfer her in 1987. Defendant then argues that the 1985 and 1986 partnership claims are time barred, as there is no actionable continuing violation in 1987 that would fall within the limitations period.

Denial of Partnership

On the 1987 partnership claim, defendant first argues that Pfau has not made out a prima facie case on her Title VII claim. In order to state a prima facie case in a Title VII case, plaintiff must allege that "(1) she belongs to a racial minority or other protected class; (2) she applied and was qualified for a position for which the employer was seeking applicants; (3) she was rejected despite her qualification; and (4) the job remained open after she was rejected and the employer continued to seek applications with plaintiff's qualification." Gibbs v. Consolidated Edison Company of New York, 714 F.Supp. 85, 88 (S.D.N.Y.1989); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Defendant argues that because plaintiff was not in active employment during 1987, she was not eligible for partnership consideration, and that she refused to accept a position in New York. However, the record shows and defendant admits that Pfau was on authorized leave and her termination did not occur until July, 1987. Although the director of National CAAG states that plaintiff was not eligible for partnership in 1987 because of her absence, plaintiff points out that there is no rule or regulation against nominating for partnership someone who is on authorized leave. Murray B. Hirsch Affidavit, ¶¶ 14–16; Pamela R. Pfau Affidavit, ¶ 56.[1]

---

**1.** The Court notes the portion of the deposition of Robert McDowell, C & L's Director of Person-

nel, submitted by defendant in which McDowell states that plaintiff was not eligible for partner-

Notwithstanding its conviction that plaintiff was unable to establish a prima facie case, defendant set forth allegedly legitimate, non-discriminatory reasons for its failure to promote and transfer plaintiff. Defendant's Memorandum at 14–22; Defendant's Reply Memorandum at 6–14. The Supreme Court has held that when the "defendant responds to plaintiff's proof by offering evidence of the reason for plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII." *United States Postal Service v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). As in the instant case, "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, *whether the plaintiff really did is no longer relevant." Id.* at 715, 103 S.Ct. at 1482 (emphasis added). The Supreme Court has continuously stressed that the prima facie standard is "not inflexible," "necessarily will vary," and was "never intended to be rigid, mechanized, or ritualistic." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 1094 n. 6, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *McDonnell Douglas, supra,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. In accordance with the holdings of the Supreme Court, the Second Circuit has held that "reviewing courts should not be preoccupied with whether a prima facie case has been established." *Sweeney v. Research Foundation of State University,* 711 F.2d 1179, 1189 (2nd Cir. 1983). The *Sweeney* Court held that courts "need not linger long over the question of whether [plaintiff] in fact established a prima facie case before we turn our attention to 'the ultimate question of discrimination *vel non.' " Id.* at 1184 (quoting *Aikens, supra,* 460 U.S. at 714, 103 S.Ct. at 1481).

The Court also notes that discovery on this point is very limited. There has been but one deposition taken on this issue, which only briefly touched on the issue of plaintiff's eligibility for partnership in 1987. Affidavit of Debra Rothman at ¶ 15. Even though defendant contends that there is no genuine issue on plaintiff's eligibility for partnership, the plaintiff points out that the defendant has not stated the existence of any written policy, rule or regulation of the firm that would effectively preclude the consideration for partnership of someone on authorized leave. In light of the glowing reports of plaintiff's contributions to the firm during her tenure, the Court cannot conclude, as defendant suggests, that there is an absence of genuine issue on plaintiff's prima facie case. While plaintiff's long absence from the firm in 1986 and 1987 certainly weakens plaintiff's case of sex based discrimination, the Court is not prepared to conclude the absence of a genuine issue.

Defendant also contends that the denial of partnership in 1987 was not an independent, discriminatory act but rather an effect of the denial for a partnership in 1986 combined with plaintiff's absence from work. This question can only be answered when the issue of whether plaintiff was eligible for partnership in 1987, itself a complex factual question, is resolved.

Finally, defendant argues that plaintiff's failure to raise the 1987 partnership claim in her Equal Employment Opportunity Commission ("EEOC") complaint precludes her from asserting it now because that claim is not "reasonably related" to the claims raised in the EEOC complaint. A court has jurisdiction to hear a Title VII claim only if it was filed with the EEOC or is "reasonably related" to claims filed with the EEOC. *See, e.g., Bradley v. Consolidated Edison,* 657 F.Supp. 197, 202 (S.D.N.Y.1987). A claim is reasonably related to the EEOC charge if it is "within

ship in 1987. Given the limited discovery on this issue, the Court cannot conclude solely from this testimony that an employee must be currently assigned and active in a particular office and practice area to be considered for partnership. Such a policy certainly would not

apply to any lateral partners the firm might hire. More importantly, there is no record before this Court that such a policy was formalized in writing, or otherwise was understood widely as a firm policy.

the scope of the EEOC investigation which reasonably could be expected to grow out of the administrative charge." *Grant v. Morgan Guaranty Trust Co.*, 548 F.Supp. 1189, 1191 (S.D.N.Y.1982); *see also Bradley, supra,* 657 F.Supp. at 202. The Court notes that plaintiff remained an employee of defendant until July of 1987, and that there is now a genuine issue on whether plaintiff was eligible for partnership in that year. If she were so eligible, then there is also at least a genuine issue at this time on whether the 1987 claim is one that "reasonably could be expected to grow out of the administrative charge" on the 1985 and 1986 claims. *Grant, supra,* 548 F.Supp. at 1191.

### 1987 Transfer

Plaintiff also claims that she was discriminatorily denied transfer between December 1986 to June 1987, which allegedly constitutes part of a continuing policy of discrimination. Defendant argues that it should be granted summary judgment on this claim because it has demonstrated that efforts were made to transfer her, as the defendant's officials met with and corresponded with Pfau about the possibility of transfer. Moreover, defendant contends that the reason plaintiff did not receive a transfer was her refusal to return to her job in New York for ninety days during which time a suitable location for permanent employment would be sought. Plaintiff acknowledged the request that she return for ninety days in a letter she sent to Murray Hirsh in New York, stating

> [w]hile I could deal with 90 days in New York, there is nothing to say that it won't continue indefinitely. Mike [Murphy] has many projects that are behind schedule that he has asked me to help with, I cannot return to a crisis situation after what I have been through.

Letter dated July 10, 1987, attached as Plaintiff's Exhibit P. Plaintiff, however, claims that genuine issues are raised by her numerous requests for a transfer to any one of C & L's regional offices. There were ninety-seven field offices at this time and plaintiff contends that the defendant has not demonstrated that it made a serious effort to transfer her; she contends that defendant's suggestion that no available positions existed was incredible.

The defendant relies on its correspondence with plaintiff, particularly her above-quoted letter in which she states that she cannot return to New York pending a transfer. According to C & L, Pfau's refusal to accept a temporary assignment in New York pending transfer prevented defendant from transferring Pfau. C & L cites one authority, a Northern District of California case, for this proposition. *See McGrath v. Permanente Medical Group*, 532 F.Supp. 6 (N.D.Cal.1979). The plaintiff in *McGrath* was a medical technologist who was terminated after taking unauthorized educational leave. Her title VII action included a claim for failure to permit her to rotate into the culture and mycology hospital rotations after she was terminated. That claim was dismissed on summary judgment because that court found that her refusal to return to work, after being told that her leave was unauthorized, resulted in her termination. The *McGrath* court found that if she had returned to work, she would have been granted the rotation she sought, as she had been scheduled for such a rotation.

■ An important difference between the present action and *McGrath* is that the issue before the *McGrath* court was whether, as a matter of law, plaintiff had any right to seek a transfer or rotation after she had been fired. In contrast, Pamela Pfau was on authorized leave between December 1986 and June 1987, the period during which she sought transfer. Clearly, a plaintiff cannot bring a claim for a discriminatory failure to transfer where the lack of such transfer is solely attributable to the plaintiff, as found by the *McGrath* court. This Court, however, cannot conclude a lack of genuine issues where, as here, the plaintiff complained of a failure to transfer long prior to her termination and the discovery on this issue is apparently incomplete. Based on the record before this Court, genuine issue are present concerning the extent to which defendant actually made an effort to transfer her.

Motion to Dismiss under 12(b)

█ Defendant maintains that plaintiff's Title VII claims based on defendant's failure to accord plaintiff a promotion to partnership in 1985 and 1986 are time barred. Defendant asserts that because plaintiff did not file the charges relating to the denial of partnership in 1985 and 1986 with the EEOC during the limitations period, she is precluded from asserting them now. Plaintiff responds and asserts that the denials of partnership in 1985, 1986, and 1987 are a continuing violation of Title VII and her claims fall within the exception to the 300–day statutory limitation. 42 U.S.C. § 2000e–5(e) states in pertinent part that an EEOC "charge shall be filed ... within 300 days after the alleged unlawful employment practice occurred" in states, such as New York, which have a law prohibiting unlawful employment practices and empowering an agency to seek or grant relief therefrom. *See E.E.O.C. v. Commercial Office Products Co.,* 486 U.S. 107, 108 S.Ct. 1666, 1669, 100 L.Ed.2d 96 (1988); *Mohasco Corp. v. Silver,* 447 U.S. 807, 817, 100 S.Ct. 2486, 2492, 65 L.Ed.2d 532 (1980); *Sharpe v. American Express Co.,* 689 F.Supp. 294, 297 (S.D.N.Y.1988). Unless the state agency terminates its proceedings in less than sixty days, a timely charge must be filed within 240 days after the occurrence of the alleged discriminatory incident to allow referral back to the E.E.O.C. within the 300 days. Defendant argues that Pfau's charges on the 1985 and 1986 discrimination fall outside the 300 day limitations period because she did not file with the EEOC until December 31, 1987.[2] Plaintiff contends that her Title VII claims are timely because they are part of defendant's continuing policy and practice of "systematically excluding females from its partnership ranks, so that in 1986, out of 1050 partners, only 25 were female." Plaintiff's Affidavit at ¶ 14. Plaintiff maintains that defendant's policy of sex discrimination culminated in defendant's failure to

accord plaintiff either a partnership or transfer in 1987. Therefore, plaintiff argues that its claims falls within the "continuing violation" exception to the 300–day limitation period. Defendant attacks the continuing vitality of this exception.

The "continuing violation" exception was enunciated by the Second Circuit in *Ache v. Beam,* 570 F.2d 57, 65 (2d Cir.1978). The *Ache* Court held that "a continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the *last occurrence* of an instance of that policy." *Id.* The court further held that if a continuing policy of discrimination were properly charged "within the statutorily required number of days following the last occurrence of an instance of that policy, then a judicially remediable violation of Title VII would be established." *Id.* This Court subsequently held that a continuing violation exists if the defendant has committed "a series of related acts, one or more of which falls within the limitation period, or ... maint[ained] ... a discriminatory system, both before, and during the [limitations] period." *Alcena v. Raine,* 692 F.Supp. 261, 271 (S.D.N.Y.1988) (quoting *Valentino v. United States Postal Service,* 674 F.2d 56, 65 (D.C.Cir.1982)).

█ In this Circuit, a plaintiff may rescue an otherwise stale discrimination claim if it constitutes a part of a continuing violation of discrimination, some of which falls within the limitations period. *Egelston v. State University College at Geneseo,* 535 F.2d 752, 755 (2d Cir.1976); *see also Noble v. University of Rochester,* 535 F.2d 756, 758 (2d Cir.1976); *Guardians Association of New York City v. Civil Service Commission,* 633 F.2d 232, 251 (2d Cir.1980), *aff'd,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). The *Egelston* Court stated that a "fresh" discriminatory policy should not be barred by the statute of limitation. *Egelston, supra,* 535 F.2d at 755. It went on to explain that "it may

---

**2.** Defendant also argues that because the EEOC deferred to the state for sixty days, the effective EEOC filing date was March 1, 1988. This Court finds this argument groundless. To follow defendant's argument would mean that a

plaintiff who files with the EEOC within the statutory period might nevertheless be time barred solely because of the internal administrative procedures of the EEOC and the state agency.

well be, of course, that plaintiff will be unable to demonstrate the existence of a policy of discrimination.... These issues are, however, best decided after trial." *Egelston, supra,* 535 F.2d at 758.

Defendant cites *Delaware State College v. Ricks,* 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980) as effectively overruling the principle established by the Second Circuit in *Egelston.* However, *Ricks* did not nullify the principle plaintiff relies on. The *Ricks* case is distinguishable from the instant case because it concerned an employee who failed to allege "discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment." *Ricks, supra,* 449 U.S. at 257, 101 S.Ct. at 504. Unlike the plaintiff in *Ricks,* whose sole contention was that a single incident, the denial of tenure, was motivated by discriminatory reasons, Pfau has alleged a continuing of policy of discrimination culminating in her denial of partnership and transfer in 1987.

Pfau has satisfied *Ricks'* mandate that plaintiff "identify precisely" the unlawful employment policy by alleging, in compliance with *Egelston* that she, and other females, were denied access to the "upper echelons" of defendant's firm because of their gender. *Ricks, supra,* 449 U.S. at 257, 101 S.Ct. at 503; *Egelston, supra,* 535 F.2d at 755. Nowhere in *Ricks* does the Supreme Court even allude to an overruling of the doctrines embraced by the Second Circuit in *Egelston.* Instead, the *Ricks* Court tailored its result to the specific facts of the case. In *Ricks,* "the only alleged discrimination occurred ... at the time the tenure decision was made." *Ricks, supra,* 449 U.S. at 259, 101 S.Ct. at 505. Thus, "even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later," there could be no continuing policy of discrimination because there was actually only one alleged discriminatory act. *Id.* In contrast to plaintiff in *Ricks,* Pfau alleges specific acts of discrimination which she contends are the culmination of defendant's continuing policy of discrimination.

As for defendant's contention that *United States v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) rejected the standard articulated by the Second Circuit in *Egelston* and invoked in *Noble* and *Guardians,* this Court disagrees. *Evans* is inapposite to the instant case. As in the instant case, the plaintiff in *Evans* contended that defendant was guilty of a continuing violation of Title VII. However, unlike the plaintiff in the instant case, respondent in *Evans* "failed to allege that ... [petitioner's employment] system differentiates between similarly situated males and females on the basis of sex." *Id.* at 558, 97 S.Ct. at 1889. The *Evans* Court stated that "[n]othing alleged in the complaint indicates that [defendant's] ... system treats existing female employees differently from existing male employees ... [and that] females hired ... acquired the same preference over respondent as males hired." *Id.* at 557, 97 S.Ct. at 1888. Most importantly, the *Evans* Court held that it was "critical" that respondent had not alleged facts establishing an existing violation that affected plaintiff. *Id.* at 558–559, 97 S.Ct. at 1888–89. In contrast to the facts surrounding *Evans,* plaintiff in the instant case has alleged the continuing existence of violations of Title VII that materially affected her, namely, defendant's failure to promote and transfer her in 1987. The motion to dismiss is therefore denied.

Equal Pay Act Claim

In her Second Amended Complaint, plaintiff adds a claim for violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), which is part of the Fair Labor Standards Act ("FLSA"). Plaintiff alleges that in 1985 and 1986, she performed work equal to that performed by male partners for less compensation. Second Amended Complaint ¶ 21.

Defendant contends that plaintiff's claim is barred by a two-year statute of limitations contained in 29 U.S.C. § 255(a). The statute provides in pertinent part that any action brought under the Equal Pay Act "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action aris-

ing out of a willful violation may be commenced within three years after the cause of action accrued." Defendant claims that "[s]ince plaintiff has failed to make any allegation that the purported violation was willful, her claim is governed by the normal two-year limitation period." Defendant's Memorandum at 36, n. 11.

■ Under 29 U.S.C. § 255(a), if defendant "wilfully" violated the Equal Pay Act, plaintiff's claim would not be time barred. Invoking the standard enunciated by the Second Circuit, this Court has held that "for the purposes of § 255, a violation is willful if the employer (1) knows or has reason to know that his business is subject to the provisions of the FLSA, and (2) his practice does not conform to FLSA requirements." *Soler v. G & U Inc.*, 628 F.Supp. 720 (S.D.N.Y.1986). This Court has also held that "[t]here is no requirement that an employer be aware that it has violated a specific provision of the FLSA." *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F.Supp. 860, 870 (S.D.N.Y.1984). Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1973) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *Egelston, supra*, 535 F.2d at 754. This Court cannot conclude that plaintiff could not prove that defendant acted wilfully.

Defendant alternatively contends that Pfau has not stated a claim because, as a matter of law, the Equal Pay Act only prohibits discrimination in pay as between employees, not as in this case, between an employee on one hand, and partners on the other hand. This Court has not found authority in this Circuit directly on the issue of whether the Act's definition of employee could include some individuals with the title "partner." Nevertheless, the Second Circuit considers Title VII and Age Discrimination in Employment Act ("ADEA") cases persuasive authority in construing the meaning of the term "employee" in Equal Pay Act claims. *Hyland v. New Haven Radiology Associates*, 794 F.2d 793, 796 (2d Cir.1986) (In ADEA action, Court recognized that the ADEA, Title VII and The Fair Labor Standards Act of 1938 have nearly identical definitions of employer and employee, and that all three statutes share the similar purpose of stamping-out discrimination). The *Hyland* Court explained that

[i]t is generally accepted that the benefits of the antidiscrimination statutes [Title VII, FLSA and ADEA] ... do not extend to those who properly are classified as partners.

794 F.2d at 797. In *Hishon v. King & Spaulding*, Justice Powell's concurring opinion explained, however, that "an employer may not evade the strictures of Title VII simply by labeling its employees as 'partners.'" 467 U.S. 69, 79 n. 2, 104 S.Ct. 2229, 2236 n. 2, 81 L.Ed.2d 59 (1984) (quoted by *Hyland, supra*, 794 F.2d at 797). The Second Circuit explained that "[i]t is by reason of their unique status as business owners and managers that true partners cannot be classified as employees." *Hyland, supra*, 794 F.2d at 797.

■ The determination of whether or not the individuals with whom plaintiff would compare herself are true partners depends on their status as true business owners and managers. In the context of an ADEA claim, this Court found that genuine issues were present concerning whether the plaintiff, who had been a low-level "partner" in a large accounting firm, was truly a partner or only an "employee." *Caruso v. Peat, Marwick, Mitchell & Company*, 717 F.Supp. 218 (S.D.N.Y.1989). In so finding, this Court declined to follow a per se rule that any individual with the title "partner" was not an employee under the act. Similarly, this Court concludes that the issue of whether the persons with whom plaintiff seeks to compare herself are true partners depends on the resolution of factual issues not appropriate for summary judgment at this time. The related issue of whether or not the "partners" in the New York office with whom plaintiff seeks to compare herself performed work equal to plaintiff is

also a factual issue that cannot be resolved on this record.

## Pendent State Claims

■ Defendant also moves this Court to dismiss plaintiff's pendent state claims under New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (McKinney's 1982), on three grounds. First, defendant argues that because New York bars a complainant who has filed her state claims with the EEOC from suing in a state court, Pfau should similarly be barred from suing in this Court.[3] This contention has already been rejected by this Court. *See Giuntoli v. Garvin Guybutler Corp.*, 726 F.Supp. 494, 503–04 (S.D.N.Y.1989).

In *Giuntoli*, this Court discussed the New York Appellate Division decision that a filing with the EEOC bars a complainant from pursuing her remedies in a state court just as if she had filed with the New York State Division of Human Rights. *Scott v. Carter-Wallace*, 147 A.D.2d 33, 541 N.Y.S.2d 780 (1st Dept.), *app. dismissed*, 75 N.Y.2d 764, 551 N.Y.S.2d 903, 551 N.E.2d 104 (1989). The First Department in *Scott* reversed and overruled earlier opinions, and held that when a complainant files a charge with the EEOC, which automatically defers the complaint to the State Department of Human Rights, the deferral acts as an election of remedies under Executive Law § 297(9). Plaintiff was therefore barred from pursuing her remedies in state court. However, the rationale in the *Scott* case does not apply to an action brought in the federal court.

The legislative intent of Section 297(9) in limiting a grievant's forum to the initial choice of either an agency or the judiciary was efficiency and avoidance of duplicative efforts. *Giuntoli, supra*, 726 F.Supp. at 502 (citing 1968 N.Y.Laws 2321 (McKinney)). This Court has held that the *Scott* conclusion "appears sound in light of the state policies which the election of remedies provision is intended to implement, but its logic does not necessarily apply in case where a plaintiff seeks to have her state law claim heard not in state court, but in federal court." *Giuntoli, supra*, 726 F.Supp. at 502. The *Scott* court has itself stated that "a grievant who files with the EEOC effectively elects ... a federal judicial forum, and it is to that forum that the grievant should look for his remedies, including any state law remedies provided by the Human Rights Law." *Scott, supra*, 541 N.Y.S.2d at 783.

In contrast, the federal purpose underlying the deferral of claims to the local agencies in a state that has provided an administrative process is to

allow the state an opportunity to resolve claims in a localized an voluntary manner.... Section 2000e–5(c) seeks to further state remedial procedures, not to circumscribe them. Yet if th[is] Court refuses, because of th[e] deferral provision, to allow plaintiff to pursue her state remedies in a judicial forum it will do not only that, but it will also frustrate efficiency goals and require duplicative proceedings in the state agency.

*Giuntoli, supra*, 726 F.Supp. at 502.

Second, defendant argues that this Court should dismiss the pendent state claims because they require interpretation of unresolved state law. Defendant states that it is not clear whether New York courts would interpret discrimination in partnership consideration as a discrimination in "term, condition, or privileges of employment" within the meaning of Section 296(1). However, defendant has pointed to neither a case nor a reason why New York courts would not consider discrimination in partnership consideration a violation of the Human Rights Law. Indeed, the Human Rights Law was enacted, *inter alia*, to ensure equal opportunity.

---

**3.** New York Executive Law § 297(9) provides, in relevant part:

Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate, unless such person had filed a complaint hereunder or with any local commission on human rights, ..., provided that, where the division has dismissed such complaint on the grounds of administrative convenience, such person shall maintain all rights to bring suit as if no complaint had been filed.

N.Y.Exec.Law § 290(3) (McKinney's 1982). The fact that the Supreme Court has held that Title VII applies to discrimination in partnership consideration is instructive. *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ("partnership consideration was a term, condition, or privilege of an associate's employment" at a law firm).

Finally, defendant argues that the pendent state claims should be dismissed because they would complicate the Title VII trial. Under the Human Rights Law, plaintiff is entitled to a jury trial. Defendant argues that the jury trial would lengthen the non-jury trial of plaintiff's Title VII claims. As stated above, however, it would be a waste of resources and unfair to require plaintiff to litigate her claims arising from the same alleged discriminatory acts in two different forums. This Court furthermore has stated that it "may seem odd that Congress should preclude punitive damages and the right to a jury trial in Title VII cases, and then permit the recognition of such rights and claims in such actions through the device of pendent jurisdiction. That is, however, an oddity for Congress to correct." *Selbst v. Touche Ross & Co.,* 587 F.Supp. 1015, 1016 (S.D.N.Y.1984). The Court therefore declines to dismiss the state claims; instead, the Court exercises its discretionary power to accept related state claims under the doctrine of pendent jurisdiction. *See, e.g., Carnegie Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[4]

Discovery Order

■ In her discovery order and accompanying clarification dated April 18, 1989 and May 3, 1989, respectively, Magistrate Roberts directed defendant to produce personnel files of candidates for partnership in the field CAAG offices and the national directorates. Plaintiff appeals from this order. She argues that in order to prove a firm-wide, systematic discrimination, she needs the personnel files of all partnership candidates for the years 1985–1987 regardless of their specialty and geographical location.

In evaluating the merit of Magistrate Roberts's discovery order, this Court can reverse only if her ruling was "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see Suggs v. Capital Cities/ABC, Inc.,* 122 F.R.D. 430, 430–31 n. 1 (S.D.N.Y.1988). Magistrate Roberts adopted defendant's argument, reasoning that relevant and meaningful comparisons cannot be made between candidates from local practice offices and those from national support functions. The Magistrate stated that because the role of managers with direct client services and those who played more of a support role, such as plaintiff, interpretation of standard criteria for partnership varied considerably. Magistrate Roberts also found, based on the number of files sought and difficulty of assembling the files, that production of personnel files of all partnership candidates in the relevant years would be burdensome.

Plaintiff relies on *Hopkins v. Price Waterhouse,* 618 F.Supp. 1109, *aff'd in part,* 825 F.2d 458 (2d Cir.), *reversed on other grounds,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) for the argument that defendant must produce personnel files of all candidates because they are necessary to support her claim of firm-wide, systematic sexual discrimination, as evidenced by sexual stereotyping in defendant's partners' evaluations of female partnership candidate.[5] However, plaintiff has not been able to point out any evidence of sexual stereotype in her own personnel and partnership candidacy file.

Even if there were some kind of sexual stereotyping in the evaluations by the part-

---

4. One point should be noted, however. It is not clear from the record whether plaintiff's state claims are still pending in the New York Division of Human Rights. Should they still be, plaintiff should request an administrative convenience dismissal from the agency.

5. It does not appear that the issue of document production was litigated, let alone compelled in *Hopkins. Hopkins, supra,* 618 F.Supp. 1109.

ners, they are irrelevant unless plaintiff can demonstrate that the stereotyping has injured her. Equally important, the partnership evaluation process used in Price Waterhouse differed from that used in C & L in one important respect. At Price Waterhouse, partnership candidates were evaluated by all partners who have come into contact with the candidate. At C & L however, all candidates from a national directorate, like Pfau, were screened before a deputy chairman, William Holland, before their candidacies were submitted for firm-wide consideration. Pfau's candidacy never proceeded to the stage of firm-wide consideration; it was twice deferred by the deputy chairman in 1985 and 1986, and never proposed in 1987. Therefore, any discrimination that would have injured her necessarily would have occurred during the national screening process, and not at a firm-wide level.

For the above reasons, Magistrate Roberts's order was well grounded in fact and law; it is not "clearly erroneous or contrary to law."

## CONCLUSION

For the reasons stated above, defendant's motions for dismissal and for partial summary judgment are both denied. The litigants are to proceed with discovery as ordered by Magistrate Roberts.

SO ORDERED.